**Affirmed and Memorandum Opinion filed December 31, 2020.**



In The

# Fourteenth Court of Appeals

## NO. 14-20-00511-CV

## IN THE INTEREST OF Z.A.R. A/K/A Z.R., A CHILD, Appellant

## V.

## TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2019-02807J**

## MEMORANDUM OPINION

Appellant C.R. ("Mother") appeals the trial court's final order terminating her parental rights and appointing the Department of Family and Protective Services ("Department") as sole managing conservator of her son Z.A.R. a/k/a Z.R. ("Bobby").[1] The trial court terminated Mother's parental rights on predicate

---

[1]We use pseudonyms to refer to the children, parents, or other family members involved in this case. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

grounds of endangerment and failure to comply with the service plan for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (O). The trial court further found that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). On appeal, Mother asserts five issues.[2] For the reasons set forth below, we affirm.

## I.     BACKGROUND

### A.     PRETRIAL PROCEEDINGS

#### 1.     REMOVAL AFFIDAVIT

The affidavit of Department caseworker Jazzmyn Hester ("Hester") states the following information regarding the June 24, 2019 referral of neglectful supervision of one and a half-year-old Bobby by his Mother:

- Mother left Bobby with a dope dealer in exchange for drugs. Mother then returned with money and the drug dealer gave Bobby back to Mother.

- Mother uses marijuana and takes ecstasy pills. Mother takes drugs daily, and there were drugs and pipes on her kitchen counter as well as crack rocks on a side table in the living room where Bobby could gain access.

- Prostitution was occurring in the home. Mother and the maternal grandmother were having sex with men for drugs.

- Maternal grandmother is using crack and cocaine.

- Father is smoking weed and sniffing powder.

- Mother and maternal grandmother physically dropped Bobby due to being under the influence of drugs.

- Mother and Bobby were staying in a home without electricity, gas, or water.

---

[2] Father has not appealed the trial court's ruling. As such, it is not necessary to address testimony and records related to Father. *See* Tex. R. App. P. 42.1.

- Bobby's hygiene is poor. He wore dirty clothing and remains in an unkept diaper for days.

- Maternal uncle, a registered sex offender, lived in the home with Mother, Bobby, and maternal grandmother. Mother alleged that her brother molested she and Bobby.

- Mother has a history of involvement with CPS regarding Bobby that went back to August 2018.[3]

The Department requested it be named Temporary Managing Conservator, due to Mother's inability to provide a safe and stable home environment for Bobby. Hester's affidavit confirmed through collateral sources a number of the reported allegations including: Mother's drug use in the presence of Bobby; Mother uses cocaine and marijuana; Mother "uses drugs heavily and lays up with two men at one time"; Mother's reports that Bobby had been sexually molested; and that Mother and Bobby were living in a home known to be a crack house without working utilities Additionally, Hester was told by collateral sources that Mother's home "had been shot at and the door had been kicked in due to drug dealers wanting their money for drugs." Hester's affidavit also stated that Mother's maternal grandmother, with whom Mother allegedly resided with Bobby, denied the Department access to view the condition of her home.

Hester interviewed Mother and attested that Mother refused to provide the Department with her home address. Hester noted that Mother claimed her cousins and uncle made the report in an attempt to get the Department to remove her child. Hester's affidavit noted that Mother initially claimed all the allegations were false, including drug use. Hester further stated in her affidavit that Mother voluntarily

---

[3] On August 18, 2018, and again on February 26, 2019, the Department received reports of similar allegations as made in this case. The referrals reported the neglectful supervision of Bobby by Mother, alleging Mother used drugs daily around Bobby and allowed Bobby to be in a home with others who use drugs and engage in illicit acts. The August 2018 report also alleged sexual abuse of Bobby by his maternal Uncle. The Department "Ruled Out" and closed both cases.

submitted to a hair drug screen analysis which confirmed Mother as positive for marijuana, cocaine, and Benzoylecgonine. Despite the results, Mother told Hester she only used marijuana. Hester included in her affidavit her observations that Bobby: appeared to be "overall healthy without any suspicious marks or bruises"; he wore clean clothes but the onesie appeared to be small; he had no shoes or socks on his feet; and he had a faint body odor as if he had not been bathed.

The Department sought to be named Temporary Managing Conservator of Bobby due to Mother's positive drug screen, Bobby's age, Mother not having a place to reside with Bobby, and no placement for Bobby to remain safe in a stable, drug-free home environment.

Based on the Department's petition, supported by Hester's affidavit, the trial court removed Bobby to the Department's care. The trial court appointed the Department as Bobby's Temporary Managing Conservator on July 9, 2019. The dismissal date for the suit was July 13, 2020.

## 2. FAMILY-SERVICE PLAN

The Department prepared a family-service plan for Mother. The plan required Mother to complete a list of tasks and services, including:

- Maintain stable housing and verifiable employment
- Attend and participate in all court hearings, Permanency Conferences, scheduled visitations, and meetings requested by DFPS or the courts
- Make the necessary arrangements for transportation to ensure the timely completion of the tasks outlined in this service plan
- Participate in psychological assessment and follow all recommendations
- Maintain a crime free lifestyle and report any new criminal charges
- Complete parenting classes and provide certification of completion to agency

4

- Participate in individual counseling and follow all recommendations
- Participate in substance and alcohol abuse assessment and follow all recommendations; and
- Participate in random drug testing

The plan also required that Mother maintain a drug-free home, provide the caseworker with her lease agreement, and obtain employment or demonstrate she was enrolled in job training. Additionally, the plan required Mother to complete individual counseling, and to refrain from engaging in illegal activities.

### 3. PERMANENCY HEARINGS AND REPORTS

On August 16, 2019, Mother did not show up for a random drug test.

The trial court held a hearing on August 28, 2019. Mother did not appear. The Department submitted a status report and submitted Mother's family plan of service. The expectations for Mother were listed, including that Mother complete a Drug and Alcohol Assessment with random urinalysis and hair follicle drug testing.

On August 29, 2020, Mother's hair drug screen analysis was positive for Benzoylecgonine, cocaine, marijuana, and marijuana metabolite.

On September 13 and 27, 2019, Mother's urine drug screen analyses were positive for marijuana. In a status report to the trial court, the Department noted that Mother completed a substance abuse assessment on August 30, 2019, but Mother continued to test positive for drugs. It was recommended that Mother complete individual substance abuse counseling and group substance abuse counseling. However, the Department reported that as of September 30, 2019, Mother had missed two classes and the Department would no longer pay for counseling.

The trial court held a permanency hearing on November 13, 2019. In a report, the guardian ad litem with Child Advocates, Inc., Bria Antoine ("Antoine"), recommended that the Department remain temporary managing conservator of Bobby. Antoine stated the basis for her recommendation as follows:

> [Mother] has initiated some of her services from the FPOS. She completed her psychosocial assessment on 08/08/19, where she was recommended to complete a psychiatric assessment. She has completed a Substance Abuse Assessment on 08/30/19 and was referred to complete individual substance abuse counseling and group substance abuse counseling. Since September, she has missed two sessions. Mother['s] . . . drug results on 8/29/19 returned back positive for Benzoylecgonine (10920 pg/mg), cocaine (>20000pg/mg), Norcocaine (372 pg/mg), Marijuana (>50.0 pg/mg), Marijuana Metabolite (2.97pg/mg) in hair follicle and in her urine she tested positive for marijuana metabolite (171 ng/ml). Per DFPS, [Mother] has tested positive for drugs for August, September, and October.

Antoine recommended that Bobby remain in his current foster placement. She reported Bobby was doing extremely well there; his needs were being met, and he was also able to receive services such as Life Skills, occupational and speech therapy; his eating habits and ability to communicate with his caregivers were both getting better. In a permanency order, the trial court noted that Mother had not demonstrated adequate and appropriate compliance with the service plan. The trial court ordered the Department to provide Mother a second opportunity for substance abuse counseling. The court further ordered: "If the mother misses two sessions without valid excuse the Department shall be excused from continuing to provide substance abuse counseling. Rescheduling without 24-hour (sic) notice shall be an unexcused absence."

The Department filed a Permanency Report to the Court—Temporary Managing Conservatorship on February 12, 2020. The Department reported

Mother's positive drug test results on June 28, 2020, July 12, 2020, August 20, 29, 2019, September 12, 26, 2019, December 19, 2019, January 3, 2020, and January 23, 2020. Thereafter, the Department filed its Second Amended Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship.

The trial court held a second permanency hearing on March 11, 2020. Antoine recommended that the Department remain as Temporary Managing Conservator of Bobby and that Bobby remain in his current foster placement. Antoine reported that Mother had been attending her visits with Bobby. "Per DFPS, she does have stable housing, but has not provided a lease. She is not currently employed." Antoine further reported that Mother had tested positive for drugs in August, September, and October of 2019. In December, Antoine reported that Mother's hair follicle drug screen was positive for cocaine. In February 2020, Mother's urine drug screening was positive for marijuana. Antoine reported that, in addition to the initial intake of allegations of drug use, Mother continued to test positive for drugs on a consistent basis.

On April 8, 2020, Mother was a "no show" for random drug screening analysis. On April 27, 2020, Mother's urine drug screen was negative; however, a hair sample collected that day was positive for marijuana.

On May 12, 2020, the Department filed a Permanency Report to the Court —Temporary Managing Conservatorship that recommended that the suit be continued and recommended a dismissal date of July 13, 2020. The Permanency Plan Goal was unrelated adoption, with the agency offering mother and father a family plan of services with the goal of returning Bobby back into the care of his

parents. Department also reported Mother's continuous positive drug screening results.

On May 29, 2020, Mother provided a hair specimen which was positive for marijuana.

On June 15, 2020, Antoine filed a report recommending that the Department be granted Permanent Managing Conservatorship of Bobby, as well as termination of parental rights, allowing for Bobby's potential adoption. Antoine represented the recommendation was based on the best interest of Bobby because the family plan of service had not been completed in its entirety, and there had been ongoing concerns regarding the use of illegal substances. Antoine's report detailed Mother's efforts to attempt to comply with the Family Service Plan:

> [Mother] has initiated some of her services from the FPOS [family plan of service]. She completed her psychosocial assessment on 08/08/19, where she was recommended to complete a psychiatric assessment. She has completed a Substance Abuse Assessment on 08/30/19 and was successfully discharged, but continued to test positive for drugs. She is currently doing an outpatient program at Santa Maria. [Mother] did not attend[] court hearings in the fall of 2019, but did appear in court on 3/11/20 and was on the call on 4/6/20. [Mother] does attend her visits with [Bobby]. Per DFPS, she does have stable housing, but has not provided a lease. She was temporarily employed by the census, but is not currently employed. Mother's . . .drug results on 8/29/19 returned back positive for Benzoylecgonine (10920 pg/mg), cocaine (>20000 pg/mg), Norcocaine (372 pg/mg), Marijuana (>50.0 pg./mg), Marijuana Metabolite (2.97 pg/mg) in hair follicle. In her urine, she tested positive for marijuana metabolite (171 ng/ml). Per DFPS, [Mother] has tested positive from drugs for August, September, October, December, January, February, and March. [Mother's] most recent urine drug screenings in April and May were negative. Her hair drug screenings continue to be positive for Marijuana.

8

Antoine recommended Bobby remain in his current foster placement, noting he was doing extremely well. She further recommended that the case be transferred to adoption preparation.

## B.  TRIAL

On June 17, 2020, the parties appeared by Zoom for the initial trial setting. The Department and Mother requested a continuance; however, the trial court deferred its ruling until after hearing from witnesses. The Department called case worker, Cynthia Ayala ("Ayala") and a representative with Court Appointed Special Advocates ("CASA"), Deirdre Carr ("Carr"). Ayala testified that it would be in Bobby's best interest to continue the hearing. Carr testified that she had no opposition to a continuance to allow Mother to continue her services. The guardian ad litem with Child Advocates, Inc., Antoine, testified that Child Advocates did not have a position on the continuance at that time. After a short break-out session, the attorney ad litem, Anna Stool ("Stool"), testified that she was bothered that Mother was still testing positive for drug use "since July of '19, which is almost a year."

Although Mother's counsel announced, "not ready," the trial court denied the continuance and proceeded to trial. All of the Department's exhibits were admitted into evidence without objection by Mother.

### 1.  MOTHER

Mother testified Bobby was born in January 2018. At that time, she was living with an uncle and grandmother. Mother stated she later lived with a friend, then she returned with Bobby to the Department's care, and subsequently left with Bobby's godmother.[4] Mother stated that the Department became involved with

---

[4] It is not clear from Mother's testimony but presumed, that when Mother left the

Bobby in this case when family members called in June 2019. At the time of the report, Mother stated she was staying with Bobby's Godmother. Mother acknowledged she had a prior case with the Department about five months prior involving drugs and abandonment.

Mother testified that she had issues with her mother taking her PlayStation or shotgun from her and trading them in to her mother's drug dealer. According to Mother, her mother made up the allegations in this case. She testified that she had never left Bobby with a drug dealer. She further denied ever leaving Bobby in a drug house. Mother also admitted that Bobby spent time with his uncle, Joshua, a convicted child offender, but she stated she was always there with them.

Mother testified that she had been using marijuana since age 19. She admitted her positive results for cocaine, but stated her marijuana was laced with cocaine. According to Mother, she never used cocaine. Mother stated the last time she used marijuana was January 2020; however, she acknowledged that her hair still tested positive for drugs. According to Mother, her hair follicles were still testing positive "due to me being around it."

Mother also testified that she completed her drug treatment with Agape Substance Abuse Program ("Agape"), but admitted she was still using drugs at the time of completion. Mother stated she did not find out until mid-March that it was recommended that she continue substance abuse treatment. Mother acknowledged that it was recommended because her urine drug screen tests were still positive. Mother testified that she had not yet completed her substance abuse services because she had to wait until virtual participation was possible because of the coronavirus. Mother stated that she was completing the substance abuse program at Santa Maria the next week.

Department's care with Bobby's godmother, she took Bobby with her. (2 RR 39, lines 22-23).

Mother testified that she never had any domestic violence incidents with Father, but admitted Father was arrested for assaulting Mother at some point after Bobby was born.

Mother testified that she had obtained an apartment in September 2019 and received assistance from the Houston Housing Authority to pay for a portion of her bills. Mother also stated that Father gave her a portion of his disability check every month, which allowed her to keep the apartment without working. Mother was in contact with Father at least monthly.

Mother testified she had a "spouse" who would spend the night occasionally. According to Mother, he worked at Whataburger. She admitted, however, that they were not married and he was her boyfriend. Mother further acknowledged that she never told the Department his name. Mother testified she planned to leave Bobby with her boyfriend or his family when she went to work.

Mother stated that she had completed individual therapy in 2019, but never received a certificate. She stated that she had not completed parenting classes because she had a hard time finding a class. Mother initially said the parenting classes cost money and the Department was unwilling to pay for them; however, Mother later acknowledged that the parenting classes were free.

Mother testified she was employed by Macy's for seasonal work from November to January 2020. According to Mother, she had been offered work with the census, but the offer was suspended because of the coronavirus. Mother testified she was recently hired by Whataburger and planned to start training the following week.

Mother acknowledged this was her third case with the Department involving Bobby. At the time of trial, Bobby was two and a half. She admitted that the

entire time she had been working with the Department and undergone drug treatment but continued to test positive for illegal substances.  Mother admitted that two years after her son was born and she was still testing positive for drugs.  According to Mother, her doing drugs on the side did not interfere with her being a mother to Bobby.  Mother testified that she had not used marijuana in front of Bobby and had never been under the influence when caring for Bobby.

Mother testified that her visits with Bobby were great and that she shared a bond with Bobby.  Mother also testified that she was adopted by a foster family and lacked any relatives or friends that would be willing to care for Bobby.  She testified she had a brother, Charles, but the Department had denied that placement because of something he did in the past.  Mother stated her brother had improved his life and she wanted the Department to reconsider him for placement for Bobby.  According to Mother, it was not her brother, Joshua, that she wanted the Department to consider for placement.  It was her brother Charles.

### 2. DEPARTMENT CASEWORKER

Ayala testified that Mother failed to complete the substance abuse treatment at Agape because she was not showing up for treatment.  Pursuant to Agape's recommendation, the Department requested that Mother continue substance abuse counseling at Santa Maria.  According to Ayala, Mother is not stable enough to care for Bobby because she is not working.  Ayala testified it would be in Bobby's best interest if Mother's rights were terminated because of Mother's constant positive drug tests.

Ayala testified that stability for Bobby has been an issue since his birth.  The Department's goal was for Bobby to have a stable home with a family that is able to meet all of his physical and mental needs.  According to Ayala, Bobby's speech is deficient for his age and he lashes out and hits adults.  Ayala acknowledged that

she had not discussed Bobby's behaviors with Mother. Ayala added that, to her knowledge, Mother had not made inquiries to anyone in the Department about how Bobby was doing.

While in the Department's care, Bobby began receiving speech therapy. Ayala further testified that she believed Bobby's significant speech deficiencies qualified him to attend a public-school preschool program for children with disabilities ("PPCD") for ages 3-5. Ayala testified that the foster parents were considering adoption but had concerns and questions with regard to adopting Bobby and his continued ability to receive services.[5] Ayala had not had a chance to speak with the foster parents but testified she would do a broadcast the next day. At the time of trial, the Department did not have a solidified permanency plan for Bobby.

Ayala testified that she heard about one-week prior to trial that Mother's boyfriend was living with Mother at Mother's apartment. Mother had not shared that information with Ayala. Additionally, Ayala testified that Mother had not discussed how she would care for Bobby if he were placed in her care because she had not started working.

Ayala testified that Mother had completed individual therapy services but, despite numerous requests over the course of four to five months, the Department had not received Mother's psychological assessment from the psychologist. The only remaining items for Mother to complete on her service plan were substance abuse treatment and parenting classes.

---

[5] Carr testified that she had discussed long-term goals with Bobby's foster parents and that they were willing to adopt him. They expressed concern whether Bobby's services would continue once adopted.

13

Ayala testified she had observed Mother's visits with Bobby and believed the visits went well. She agreed Bobby was bonded with Mother. Ayala had no concern that Mother would harm Bobby during visits. Ayala testified that Mother appeared to demonstrate good parenting skills during the visits Ayala observed. Ayala acknowledged that the Department had asked for a continuance to continue working with Mother; however, at trial the Department no longer wanted to work with Mother because of Mother's positive drug tests. According to Ayala, for the Department to support reunification, Mother would need to show a negative drug test, complete services, and have a stable income. Ayala also expressed concern over who Mother would leave Bobby with.

### 3. COURT APPOINTED SPECIAL ADVOCATE

Carr testified that Bobby should not be returned to Mother because Mother had not completed her services. Carr's primary concern was that Mother continued to show positive drug screening results. Additionally, Carr testified that Bobbly was in a stable home, making progress on his various services, and there was concern that Bobby's progress would not continue if he were returned to Mother. Carr further testified that Mother had not been working and the first time Carr heard about Mother's upcoming job at Whataburger was the day of trial. According to Carr, Bobby was in a place where he was thriving and it was in his best interest for him to stay there.

On cross-examination, Carr testified that she did not know if Mother would be successful in completing her services if given more time. Carr testified that Mother had time in the beginning of the case but did not start services until later. Carr further testified that Mother was still testing positive for drugs, and, by Mother's own admittance, continued to use drugs.

### 4. GUARDIAN AD LITEM

Mother called Antoine to testify. When asked if Child Advocates would support allowing Mother to have more time to complete her services, Antoine responded that Child Advocates was "indifferent." Antoine further testified that "[w]e don't go either way about it. If the Judge allows it to go with it, then we have no choice on it, but we're not going to vouch for her to do that."

## C. TRIAL COURT'S FINDINGS

The trial court found Mother and Father engaged in the conduct described in subsections D, E, and O of section 161.001(b)(1) of the Family Code. The court additionally found termination of each parent's rights was in Bobby's best interest. The trial court appointed the Department to be Bobby's managing conservator. Mother timely appealed.

## II. ANALYSIS

In Mother's first and second issues, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate grounds of endangerment under subsections D and E, and failure to comply with the court ordered family-service plan under subsection O. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). In her third issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in Bobby's best interest. *See* Tex. Fam. Code § 161.001(b)(2). In Mother's fourth and fifth issues, she challenges the trial court's appointment of the Department as Bobby's managing conservator. *See* Tex. Fam. Code §§ 153.131, 153.191.

## A. STANDARDS OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

The heightened burden of proof in termination cases results in a heightened standard of review. *See In re J.F.C.*, 96 S.W.3d at 266. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible.

16

*Id*. However, this does not compel us to disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*.

In reviewing the factual sufficiency of the evidence under the clear and convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (internal quotation marks omitted). We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

In contrast to termination findings, conservatorship determinations made after a bench trial are governed by a preponderance of the evidence standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The appointment of a conservator is subject to review for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *Id.* (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

## B.   PREDICATE GROUNDS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1) of the Family Code; and (2) termination is in the best interest of the

17

child.  Tex. Fam. Code § 161.001(b)(1), (2); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam).

In this case, the trial court made predicate termination findings that Mother had committed acts establishing the grounds set out in subsections D, E, and O of section 161.001(b)(1), which provides for termination of parental rights if the factfinder finds by clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> * * *
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child

Tex. Fam. Code §§ 161.001(b)(1)(D), 161.001(b)(1)(E), 161.001(b)(1)(O).

If, as here, a trial court finds multiple predicate violations, we will affirm on any one violation that is established by clear and convincing evidence.  *See In re A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[6] "[a]llowing section

---

[6] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and

161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Thus, when as here a parent challenges predicate termination grounds under either subsection 161.001(b)(1)(D) or (E), or both of those subsections, we must address and detail our analysis under one of those subsections. *See id.*

In her first and second issues, Mother argues the evidence was legally and factually insufficient to support termination under all predicate grounds found by the trial court—subsections 161.001(b)(1)(D), (E), and (O). We will address the trial court's finding of endangerment under subsection 161.001(b)(1)(E).

## C. TERMINATION OF MOTHER'S PARENTAL RIGHTS BASED ON PREDICATE GROUND OF ENDANGERMENT UNDER SUBSECTION (E)

By making the subsection (E) finding, the trial court determined that Mother had engaged in conduct or knowingly placed Bobby with persons who engaged in conduct that endangered Bobby's physical or emotional well-being. Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.— Houston [14th Dist.] 2014, pet. denied). Termination of the parent-child relationship under subsection (E) must be based on more than a single act or

---

convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." *Id.* §'161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

19

omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Our court recently clarified that a showing that a parent use of illegal drugs is not, on its own, sufficient evidence of endangerment, and that there must be a showing of a causal connection between the parent's drug use and endangerment of the child. *In re L.C.L.*, 599 S.W.3d 79, 84–86 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc) (concluding that mother's drug use alone is insufficient to support endangerment finding without causal connection between parent's drug use and alleged endangerment). Against this backdrop, we consider whether the record provides factual support for the endangerment finding.

### *Endangering Conduct and Environment*

This case is distinguishable from L.C.L. in that there is evidence of a causal connection between Mother's drug use and endangerment of Bobby. *See* 599 S.W.3d at 84–86. As set forth below, Mother failed to complete her court-ordered family-services plan; she did not maintain employment; she did not complete her drug treatment programs; she continued to test positive for illegal substances

20

(*e.g.*, marijuana and cocaine) while Bobby was in the Department's conservatorship and Mother's relationship with Bobby was at stake; and she did not complete her parenting class, despite having almost a year to do so.

In an August 2019 family evaluation, Mother stated that Father had never been abusive to her or to Bobby. Father's criminal records, however, show that he was arrested and charged with assault of a family member in January 2019. Mother was the victim of the assault and, at trial, admitted that Father had been arrested for assaulting her after Bobby was born, but denied that it had occurred, claiming it was only an argument.

The Department received a referral in August 2018 alleging neglectful supervision of Bobby, and that Bobby was sexually abused by his maternal uncle. During this time, Mother tested positive several times for cocaine and marijuana use. After several of Mother's urine tests in 2018 came back clean, the Department ruled out the referral. Mother testified she never used cocaine. In June 2019, this case, the third referral to the Department, alleged an uncle who was a registered sex offender was in the home and that Mother reported that the uncle molested her and Bobby. The Child Advocates report indicated that witnesses confirmed that Mother had alleged that the uncle had sexually molested her and Bobby. Mother admitted that her brother, Joshua, was a registered sex offender. Mother acknowledged that she allowed Bobby to be around his uncle and she was spending time with Joshua at the time Bobby came into the Department's care.

Mother had a history of unstable housing. In her August 2019 family evaluation, Mother admitted that at the time of the referral she did not have stable housing. At that time, Bobby was 19 months old. The dates and timelines Mother provided on her family evaluation are inconsistent with the dates and times provided by Father and inconsistent with her trial testimony. Father stated Mother

was in foster care when she first met him in mid-2016. When Mother "aged out" of foster care at age 18, she moved in with Father. Father separated from Mother around April 2019.

Mother, however, testified that she had been living with her grandmother (and uncle) for three years. Mother stated she had moved in with her grandmother after she was assaulted by her apartment manager. Mother stated the apartment manager made false reports to the Department about Mother's care of Bobby. Thereafter, Mother testified that, at some point, she had to leave and moved to a friend's house, then she "aged [herself] back into the Department's care, and thereafter moved in with her Godmother. According to Mother, at the time of the third referral, Mother was living with Bobby's "Godmother." At trial, Mother testified that she had had her own apartment since September 2019. She received public assistance housing combined with a portion of Father's disability check to pay for housing while unemployed. Mother's lease expired in September 2020. Among Carr's primary concerns was the stability of Mother's home should Bobby be returned to Mother. Carr testified that Bobby should not be returned to Mother.

Mother testified she did not have a support system to help her with Bobby. She was a foster child. She did not have a family member to assist with Bobby's care while she worked. At trial, Mother disclosed for the first time to the Department that she had a "spouse," but Mother subsequently admitted she was not married and she had a boyfriend who stayed at her house from time to time. Mother stated he or his family would watch Bobby when she could not. Mother admitted that she had not shared information about the boyfriend or his family with the Department.

Mother also lacked stable employment. Mother testified that she had worked at a store for approximately nine months, between June 2018 and February

2019. According to Mother, she could not get the shifts she needed due to an earlier Department referral and she quit that job. Mother was not working at the time of her family evaluation in August 2019. At trial in June 2020, Mother testified her last job was seasonal work at Macy's between November 2019 and January 2020. Mother stated she was going to work for the census but the census was delayed due to the coronavirus. At trial she advised the Department for the first time that she had been recently hired at Whataburger and planned to start training the following week. Carr also noted at trial that Mother had not mentioned getting hired by Whataburger.

Finally, Mother had a history of illegal drug use. Mother's first referral in August 2018 alleged neglectful supervision and sexual abuse by a maternal uncle. Although the Department eventually ruled out the referral, urine and hair samples collected were positive for marijuana or marijuana and cocaine. Mother testified that she only smoked marijuana and did not use cocaine; yet hair follicle results were positive for both marijuana and cocaine in August and November 2019. Mother testified that her marijuana was laced with cocaine without her knowledge. Mother also testified that she last used marijuana in January 2020 but her hair remained positive and her urine was positive through March 2020. Mother stated her hair was still positive because she was around people using marijuana.

On June 24, 2019, the Department received its third referral regarding Bobby. As summarized in an exhibit admitted into evidence at trial without objection, the referral to the Department in this case alleged:

> [Mother] left [Bobby] with a drug dealer for drugs. [Mother] smokes marijuana and takes Ecstasy. . . .Drugs and paraphernalia were located on a kitchen counter. Crack cocaine was located on a side table in the living room where [Bobby] could gain access. [Bobby's] clothes were dirty and his diaper was kept on for more than two days. The lights, gas, and water were off in the home.

The unobjected-to evidence further noted that witnesses confirmed that Mother takes drugs daily, and Mother and the maternal grandmother were having sex with men for drugs. Moreover, evidence admitted at trial provided that the maternal grandmother denied the Department access to view the condition of her home.

Although Mother denied the reports of her drug use and prostitution in front of Bobby and denied leaving Bobby alone with her brother, a sex offender, we must provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d at 109. Here, a reasonable fact finder could have formed a firm belief or conviction that its endangerment finding under subsection (E) was true. Additionally, a reasonable fact finder could have believed from the evidence at trial that Mother's home frequently changed; there was drug use in the home with drugs left on the table within Bobby's reach; there was domestic violence in the home between Mother and Father; there was a boyfriend, who Mother did not disclose to the Department that periodically stayed in Mother's home; Mother failed to complete her court-ordered family-services tailored to protect Bobby; and Mother was unemployed. Further, Mother tested positive for drugs 20 of 25 times over a twenty-one-month period. We give due deference to these findings. *In re H.R.M.*, 209 S.W.3d at 108.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under subsection 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under subsection

24

161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection (E) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsections (D) or (O) findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

We overrule Mother's first and second issues.

## D.     BEST INTEREST OF THE CHILD

Next, we turn to Mother's third issue—her legal and factual sufficiency challenge to the trial court's best-interest findings.

### 1.     LEGAL STANDARD

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *Id*. § 263.307(a). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed

25

placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment). A best interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the child has with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

**2.    SUFFICIENCY OF THE EVIDENCE**

***The child's desires and plans for the child***

We begin by addressing collectively the child's desires and plans for the child. Bobby was removed when he was approximately one and one-half years old and was two and one-half years old at time of trial. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Here, the Department's caseworker, Ayala, testified that Bobby needs speech therapy because he is not on track for his age. Ayala also stated Bobby has some behavior issues. Ayala testified that Bobby lashes out at people, he has hit

26

adults, and he has "different moods," such that he does not want to talk to anyone or just stays quiet and does not respond. Ayala testified that it was the Department's long-term goal to give Bobby a stable home, a family that was able to meet all of his needs, physically and mentally. The evidence reflects that Bobby was thriving in his placement with the foster parents. As such, Carr testified it was in his best interest to stay in his current placement.

With positive evidence supporting his placement with foster parents, the first and sixth *Holley* factors weigh in favor of termination.

### The child's present and future physical and emotional needs, Mother's parenting abilities, assistance programs available, and stability of the home

The record contains evidence that Mother had multiple visits with positive interactions with Bobby and that Mother acted appropriately during the visits.

Mother, however, remained unproven in her ability to provide stability and certainty to Bobby. The record also contains evidence that 20 of 25 drug-test samples taken from Mother over a 21-month period tested positive for drugs. All the positive samples included marijuana. Five of the samples included cocaine. All of the samples were taken when Mother was under Department and court scrutiny and her parental rights were at risk. Substance abuse can negatively affect one's parenting ability (the fourth *Holley* factor) and also shows an element of instability in the home environment (the seventh *Holley* factor). *In Interest of M.M.-Y.P.*, 01-15-00258-CV, 2015 WL 5074147, at *5 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.). Mother's substance abuse started in 2017 and continued throughout the pendency of the case despite attending substance abuse classes.

Moreover, evidence of domestic violence with Father also supports the trial court's finding that Mother endangered Bobby's well-being. *See In re M.S.L.*, No.

14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.).

The Department agreed that Mother and Bobby appeared bonded. This bond, however, "cannot override or outweigh evidence of danger to the child, or can it compensate for the lack of an opportunity to group up in a normal and safe way equipped to live a normal, productive, and satisfying life." *Interest of T.L.E.*, 579 S.W.3d 616, 627 (Tex. App.—Houston [14th Dist.] Oct. 18, 2019, pet. denied).

There also is evidence that Mother had not completed her family-service plan. Mother failed to attend court hearings in August or November 2019, which was in violation of her family-services plan. She initially failed to attend her substance abuse classes at Agape but was given a second chance by the trial court. She failed to participate in parenting classes despite having had nearly a year prior to commencement of trial. Mother failed to maintain meaningful employment, only having worked a seasonal job a Macy's. She testified that she had been hired by Whataburger but failed to notify the Department or CASA prior to trial. Although Mother claimed she was nearly done with her substance abuse class at Santa Maria, Mother had not provided a clean hair follicle sample.

Mother stated she could afford her apartment even though she was not working because a portion of it was subsidized and Father gave her money from his disability check. She claimed a boyfriend lived with her on and off again and that she planned to leave Bobby in his or his family's care when she was at work, but she never provided the Department with his name to evaluate the safety of such an environment. She also had not finished her parenting classes. While the Coronavirus may have provided a disruption of in-person services from March to

28

June 2020, this does not explain Mother's delay and/or inability to complete such services from August 2019 to March 2020.

At the time of trial, Bobby had lived almost half his life with his foster parents. His foster parents were taking care of his physical and emotional issues. Bobby was receiving speech and life skills that were helping him tremendously. Bobby was eating and communicating better. The foster parents were planning to enroll Bobby in PPCD to receive addition services through their school district. Although the foster parents expressed concern over continuity of services after an adoption, the foster family was willing to adopt Bobby. The trial court reasonably could have concluded from the Department's caseworker, Ayala, and the CASA representative that there were concerns about Mother's stability and whether Bobby would continue to progress with services.

In light of these considerations, we conclude evidence implicating the second, fourth, fifth, and seventh *Holley* factors show that termination of Mother's parental rights support the best-interest finding.

### The present and future emotional and physical danger to the child

A parent's substance abuse supports a finding that termination is in the best interest of the child. *In re E.R.W.*, 528 S.W.3d at 266. The fact finder can give "great weight" to the "significant factor" of drug-related conduct. *Id*.; *see also Interest of Z.H.*, 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (considering parents' drug use in the context of evaluating the present and future emotional and physical danger to the child).

The record demonstrates that Bobby was, throughout the course of his first year and one-half of life, consistently exposed to Mother's instability and drug use. The Department received three referral regarding Bobby, including for neglect as a

result of Mother's drug use, instability in her home, and his exposure to unsafe relatives. All of Mother's hair follicle test from 2018, 2019, 2020 were positive for illegal substances.

Because the record contains evidence showing the possibility that Mother's drug problem would persist and thus present a future emotional danger to Bobby, the third *Holley* factor supports the trial court's best-interest finding.

### *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuses for those acts or omissions*

In determining the best interest of the child in proceedings for termination of parental rights, the trial court properly may consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The guardian ad litem, Antoine, the Department's caseworker, Ayala, and the attorney ad litem, Stool, all agreed that Mother did not comply with the Department's court-ordered service plan. Most significantly, Mother's continued substance abuse and failure to test negatively violated the court-ordered plan. Mother continued to fail drug tests, which revealed that Mother continued to place herself in environments with drug exposure and continued to ingest drugs. Mother's pattern of drug abuse reflects a lack concern for Bobby's future safety and well-being. *In re E.R.W.*, 528 S.W.3d at 266–67 (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family-service plan in holding the evidence supported the best interest finding).

The eighth *Holley* factor favors the trial court's determination that termination of Mother's parental rights would be in Bobby's best interest, and at best, the ninth Holley factor is neutral.

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in Bobby's best interest. *See J.O.A.*, 283 S.W.3d at 344. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination is in Bobby's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is in the best interest of Bobby. *See* Tex. Fam. Code § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72.

We overrule Mother's third issue.

## E.    CONSERVATORSHIP DETERMINATION

In her fourth and fifth issues, Mother challenges the trial court's appointment of the Department as Bobby's managing conservator.

### 1.    SECTION 153.191

In her fourth issue, Mother maintains the trial court erred when it failed to appoint her as Bobby's possessory conservator because the trial court failed to make the requisite findings pursuant to section 153.191 of the Family Code.

Section 153.191, entitled "Presumption that Parent to be Appointed Possessory Conservator," provides that "[t]he court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession would endanger the physical or emotional welfare of the child." Tex. Fam. Code § 153.191. Contrary to Mother's contention, the trial

court did not err in not making findings under this provision because this section only applies to "a parent" and Mother's parental rights to Bobby were terminated by the trial court. *See* Tex. Fam. Code §§ 153.191; 161.206; *In re H.M.P.*, No. 13-08-00643-CV, 2010 WL 40124, at *17 (Tex. App.—Corpus Christi Jan. 7, 2010, no pet.). There is no authority for Mother's contention that when a parent's rights have been terminated, a trial court is required to make separate findings that parental possession or access would endanger the physical or emotional welfare of the child. *See id*.

Mother's fourth issue is overruled.

### 2. SUFFICIENCY OF THE EVIDENCE

In her fifth issue, Mother argues that there was insufficient evidence to support the trial court's appointment of the Department as Bobby's managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child."

Tex. Fam. Code § 161.207(a). The trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Having concluded the evidence is sufficient to support the termination of Mother's parental rights, we conclude the trial court had sufficient information on which to exercise its discretion and did not abuse its discretion in appointing the Department as sole managing conservator of Bobby. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding in which evidence was sufficient to support termination of parental rights).

We overrule Mother's fourth and fifth issues.

### III.   Conclusion

We affirm the trial court's decree terminating Mother's parental rights and naming the Department as Bobby's managing conservator.


/s/     Margaret "Meg" Poissant
Justice


Panel consists of Justices Jewell, Zimmerer, and Poissant.